Argued and submitted on remand from the Oregon Supreme Court May 22, reversed and remanded September 10, respondent William R. Marshall's petition for reconsideration filed September 15, allowed by opinion November 19, 1997 See 151 Or App 346 (1997)

Janice M. MEARS,
*Appellant,*

*v.*

William R. MARSHALL, M.D.,
and Collagen Corporation,
*Respondents.*

(9307-04839; CA A85078)

944 P2d 984

Maureen Leonard argued the cause for appellant. With her on the briefs was Kathryn H. Clarke.

Janet Schroer argued the cause for respondent William R. Marshall, M.D. With her on the brief was Hoffman, Hart & Wagner.

Joe W. Redden, Jr., Houston, Texas, argued the cause for respondent Collagen Corporation. With him on the brief were Eric J. Neiman, Tooze Duden Creamer Frank & Hutchinson, Curt Webb and Beck, Redden & Secrest.

Before Riggs, Presiding Judge, and Landau and Leeson, Judges.

LEESON, J.

## LEESON, J.

The Oregon Supreme Court remanded this case for further consideration in the light of *Medtronic, Inc. v. Lohr*, 518 US ____ , 116 S Ct 2240, 135 L Ed 2d 700 (1996), which was decided by the United States Supreme Court after our decision in *Mears v. Marshall*, 137 Or App 390, 905 P2d 1154 (1995), *on recons* 138 Or App 476, 909 P2d 212 (1996), *vac'd* 324 Or 130, 921 P2d 966 (1996). The issue is whether various state tort claims are preempted by the Medical Device Amendments of 1976 (MDA) to the Food, Drug and Cosmetics Act, 21 USC § 301 *et seq.* In our previous decision, we concluded that a number of the state claims at issue were preempted and upheld the trial court's grant of summary judgment for defendants as to those claims. In the light of the two-pronged test set forth in *Medtronic,* we conclude that plaintiff's state law claims are not preempted. Consequently, we reverse the trial court's grant of summary judgment to defendants and remand.

We recite the facts as they appeared in our initial opinion:

"Plaintiff brought this action for damages for personal injuries she sustained after receiving medical treatments to remove facial wrinkles. Defendant Marshall, her physician, administered four injections of Zyderm and Zyderm FL, products designed, manufactured and marketed by defendant Collagen Corporation (Collagen). Plaintiff appeals from the trial court's grant of summary judgment for defendants on the ground that all of plaintiff's claims are preempted by the Medical Device Amendments of 1976 (MDA) to the Food, Drug and Cosmetics Act, 21 USC § 301 *et seq.* * * *

"Zyderm is a medical implant composed of purified bovine collagen, a protein extracted from calf hide that is similar to the human collagen that provides texture and suppleness to the skin. Zyderm is injected into the skin to smooth out facial contours such as smile and frown lines that result as the naturally occurring collagen in the skin breaks down as part of the aging process. Treatment consists of a skin test to determine whether the prospective patient has any untoward sensitivity to the material, followed by a series of injections at intervals of at least two

weeks. Because the cosmetic effects are not permanent, most patients choose to receive touch-up treatments within 6 to 24 months. Plaintiff received injections of Zyderm in April, May and June 1991 and of Zyderm FL in August 1991. Zyderm FL contains the same collagen material as Zyderm, but it is injected with a smaller gauge needle to correct fine lines that develop around the eyes.

"Under the MDA, medical devices intended for human use are classified by the federal Food and Drug Administration (FDA) into one of three categories, depending on the level of regulation needed to provide reasonable assurances of safety and effectiveness. See 21 USC § 360c (establishing classifications). Class I devices pose little or no threat to health and safety and are subject to only general controls over manufacturing processes. Id. at § 360c(a)(1)(A). Tongue depressors, elastic bandages, ice bags and bed pans are common examples of Class I devices. Robert S. Adler and Richard A. Mann, Preemption and Medical Devices: The Courts Run Amok, 59 Mo L Rev 895, 913 (1994). Class II devices are more complex, requiring special controls such as performance standards, postmarket surveillance, patient registries, guidelines and recommendations deemed necessary to assure safety and effectiveness. 21 USC § 360c(a)(1)(B). Examples of Class II devices are syringes, hearing aids, bone plates, and condoms. Adler and Mann, 59 Mo L Rev at 913. Class III devices are those that cannot be classified into Classes I or II because of insufficient information to determine whether general controls will 'provide reasonable assurances of [their] safety or effectiveness,' and are either purported to be 'for a use in supporting or sustaining human life or * * * of substantial importance in preventing impairment of human health' or 'present a potential unreasonable risk of illness or injury.' 21 USC § 360c(a)(1)(C). Class III devices include pacemakers, IUDs and replacement heart valves. Adler and Mann, 59 Mo L Rev at 914. The Zyderm collagen implants in this case are Class III devices.

"The manufacturer of a Class III device must obtain premarket approval (PMA) from the FDA by submitting an application that presents all available scientific knowledge concerning investigations of the device's safety and effectiveness; detailed information regarding its design, components, ingredients, properties, and principles of its operation; a full description of manufacturing methods and

facilities; any applicable performance standards; samples of the device; specimens of proposed labeling; and other information deemed relevant by the FDA.[1] 21 USC § 360e-(c)(1); 21 CFR § 814.20. PMA applications are reviewed by a panel of experts, which makes recommendations to the FDA. 21 USC § 360e(c)(2). The FDA may approve a device for sale or return the application for additional information or testing of the device. *Id.* at § 360e(d)(1). The FDA must inform the applicant of the measures needed to correct a deficient application. *Id.* at § 360e(d)(2).

"Even after a PMA application has been approved, a device remains subject to post-approval regulation. *Id.* at § 360e(e); 21 CFR § 814.82(a). The manufacturer must maintain certain records and make reports to the FDA, 21 USC § 360i; 21 CFR § 814.82, and must not manufacture, package, store, label, distribute or advertise the device 'in a manner inconsistent with any conditions to approval specified in the PMA approval order for the device.' 21 CFR § 814.80. With only minor exceptions, the manufacturer must also submit a PMA supplement for FDA review and approval before making changes that affect the safety or effectiveness of an approved device. 21 CFR § 814.39. The FDA retains the power to withdraw approval of a device on the basis of new information, or if it discovers that the manufacturer submitted false or misleading information in its PMA application or otherwise fails to comply with the MDA or conditions of PMA approval. 21 USC § 360e(e). The FDA has limited remedial power to require the manufacturer to notify the public of newly discovered risks; to order repair, replacement, or refund of the purchase price of a device; and to order recall of a device. *Id.* at § 360h. Additionally, a device manufacturer is subject to criminal penalties for certain prohibited acts and may be assessed civil penalties by the FDA. *Id.* at §§ 331, 333. It is generally understood, and the parties in this case do not disagree, that there is no private right of action under the Food, Drug and Cosmetics Act. *See Talbott v. C.R. Bard, Inc.*, 865 F Supp 37, 45 (D Mass 1994), *aff'd* 63 F3d 25 (1st Cir 1995) (citing four federal circuit court cases and four federal district court cases so holding); *see also King v. Collagen Corp.*, 983 F2d 1130, 1140 (1st Cir), *cert den* [510] US [824], 114 S Ct 84, 126 L Ed 2d 52 (1993) (no implied right of action).

"The FDA, upon recommendation of its Surgical and Rehabilitation Devices Panel, approved Collagen's PMA

application for Zyderm by letter on July 22, 1981, and by order published on September 18, 1991. 46 Fed Reg 46,394 (1981). PMA approval was made subject to a set of conditions including an extension of the post-approval immunological study; distribution with the device of a patient information brochure; submission in final printed form of labeling and informational package inserts; prior submission of PMA supplements before making changes involving indications for use, labeling, manufacturing, packaging or ingredients; and required reports. Between initial PMA approval and the time plaintiff began treatment, Collagen had submitted 16 PMA supplements seeking approval for changes in ingredients, manufacturing processes, labeling and physician's package inserts. Changes were approved only after Collagen complied with FDA requests to submit additional data or to include specified language on labels or physician's package inserts.

"Plaintiff alleges that the injections administered by Marshall triggered immune and autoimmune reactions that caused 'numbness, swelling and soreness in her face; dizziness; vertigo; and visual disturbances[,]' some of which 'more likely than not, will be permanent.' She brought this action against Collagen and Marshall on claims of strict products liability, breach of express warranties and breach of implied warranties of merchantability and fitness; against Collagen on a claim of negligence; and against Marshall on a claim of medical negligence, including counts of breach of the duty of care and failure to obtain informed consent. The trial court granted Marshall's motion for summary judgment on the claims against him for strict products liability, breach of implied warranties and breach of express warranty with respect to the device itself, but denied the motion 'as to the alleged warranty of the services' and the medical negligence claims. While that motion was pending, plaintiff filed a second amended complaint reiterating the claims against both defendants, but further alleging as part of each claim that Zyderm FL had not been approved by the FDA at the time of plaintiff's injection with that product. Subsequently, each defendant moved for summary judgment on the grounds that plaintiff's claims are preempted by the MDA and are also barred by the statute of limitations. The trial court entered judgment on its orders granting summary judgment to both defendants 'under the doctrine of federal preemption with respect to Zyderm Collagen Implant and Zyderm FL.'

"On appeal, plaintiff's three assignments of error involve preemption analysis under the MDA. She argues that the trial court erred in holding: (1) that her claims are preempted with respect to the manufacturer, Collagen; (2) that even if her claims against Collagen are preempted, they are not with respect to her treating physician, Marshall; and, (3) that even if claims against both defendants are preempted, preemption would be proper only for claims involving Zyderm, not Zyderm FL. Marshall cross-assigns error to the trial court's denial of his first motion for summary judgment with respect to plaintiff's breach of warranty claim.[2]

---

"[1] There are two exceptions to the Class III PMA [Pre-Market Approval] requirement: devices that are granted an investigational device exemption (IDE) under 21 USC § 360(g) to allow clinical testing on humans; and devices that are determined to be 'substantially equivalent' to a device that was on the market before the MDA became effective in 1976, which are subject only to a less rigorous 90 day premarket notification process under 21 USC § 360(k). * * *

"[2] Marshall's brief characterizes the trial court's denial of the motion for summary judgment with respect to 'breach of an *implied* warranty of service.' (Emphasis supplied.) The trial court's order specifically denied in part the motion involving the 'Third Claim for Relief for breach of express warranty.' Plaintiff's fourth claim for relief, for which Marshall was granted summary judgment, was the claim for breach of implied warranty. We take Marshall's assignment to suggest that the trial court erred with respect to plaintiff's express warranty claim."

*Mears v. Marshall*, 137 Or App at 392-96.

The question is whether, or to what extent, plaintiff's claims are preempted by the MDA, which contains the following preemption provision:

"(a) Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—

"(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and

"(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter."

21 USC § 360k.

The United States Supreme Court granted the cross-petitions for *certiorari* in *Medtronic*, "[b]ecause the Courts of Appeals are divided over the extent to which state common-law claims are pre-empted by the MDA."[1] *Medtronic*, 116 S Ct at 2250. *Medtronic* involved the question of preemption in the context of state common-law claims against the manufacturer of a pacemaker lead that had been marketed pursuant to 21 USC, section 360K, also known as a section 510(k) exception, as a device that was "substantially equivalent" to devices that already were on the market when the MDA was enacted. The plaintiffs alleged that they had been harmed when the pacemaker failed. The complaint alleged that the manufacturer was negligent because it failed to use reasonable care in the design, manufacture and sale of the pacemaker lead and in failing to warn or properly instruct concerning potential failure of the device. *Id.* at 2248. The plaintiffs also alleged that the manufacturer was strictly liable because the pacemaker lead was defective and unreasonably dangerous. *Id.*

The Court began its analysis in *Medtronic* with a discussion of the provisions of the MDA and its history and purpose. *Id.* at 2246-48. It explained the relative ease with which a manufacturer can obtain approval to market a medical device that is "substantially equivalent" to a device that was on the market before the enactment of the MDA: "[Section]

---

[1] Justice Stevens' lead opinion in *Medtronic* is in part a majority opinion and in part a plurality opinion. Predictably, federal courts of appeals remain divided in the wake of *Medtronic*. *Compare Chambers v. Osteonics Corp.*, 109 F3d 1243 (7th Cir 1997) (strict liability claim concerning Class III hip prosthesis marketed pursuant to IDE was preempted) *with Oja v. Howmedica, Inc.*, 111 F3d 782 (10th Cir 1997) (strict liability claim concerning Class III hip prosthesis marketed pursuant to § 510k process and IDE process was not preempted).

Unless otherwise specifically noted, the portions of the opinion discussed here are the portions in which a majority of the Court joined.

510(k) notification requires little information, rarely elicits a negative response from the FDA, and gets processed very quickly." *Medtronic*, 116 S Ct at 2247, *quoting* Adler, *The 1976 Medical Device Amendments: A Step in the Right Direction Needs Another Step in the Right Direction*, 43 Food Drug Cosm LJ 511, 516 (1988).

The Court then turned to the MDA's preemption provision, 21 USC § 360k, quoted above, to determine its scope. The Court reiterated that the powers of the states will not be deemed to be superseded by federal legislation "unless that was the clear and manifest purpose of Congress." *Medtronic*, 116 S Ct at 2250, *quoting Rice v. Santa Fe Elevator Corp.*, 331 US 218, 230, 67 S Ct 1146, 1152, 91 L Ed 1447 (1947). Consequently, the Court looked to the congressional purpose behind the MDA to determine the scope of the preemption provision. *Medtronic*, 116 S Ct at 2251-52.

In Part IV of its opinion, a plurality of the Court rejected the defendant's assertion that the plain language of section 360k "pre-empts any and all common-law claims brought by an injured plaintiff against a manufacturer of medical devices." *Id.* at 2251. The plurality found that argument "unpersuasive" and "implausible," because the statutory scheme and its legislative history revealed no intent to deny relief to those injured by defective medical devices: "It is, to say the least, 'difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct[.]' " *Id.* at 2251, *quoting Silkwood v. Kerr-McGee Corp.*, 464 US 238, 251, 104 S Ct 615, 78 L Ed 2d 443 (1984). The plurality concluded that Congress did not intend such sweeping preemption but "was primarily concerned with the problem of specific, conflicting State statutes and regulations rather than the general duties enforced by common-law actions." *Medtronic*, 116 S Ct at 2251.

In Part V of its opinion, the Court considered whether some common-law actions nonetheless are preempted under section 360k. The defendant argued that the defective design claim was preempted because of the FDA's "continuing authority" to withdraw its approval if the defendant altered the design such that the pacemaker lead was no longer "substantially equivalent" to a device that had been on

the market before the enactment of the MDA. The Court disagreed that the FDA's authority to do so constitutes a "requirement" for purposes of section 360k, because the approval process under section 510(k) focuses on *equivalence,* not safety." *Id.* at 2254 (emphasis in original). Under the section 510(k) process, the FDA did not require that the defendant's pacemaker lead "take any particular form for any particular reason; the agency simply allowed the pacemaker, as a device substantially equivalent to one that existed before 1976, to be marketed without running the gauntlet of the PMA process." *Id.*

Concerning the plaintiffs' manufacturing and labeling claims, the Court explained that the plaintiffs had alleged that the pacemaker lead failed to comply with FDA manufacturing and labeling requirements. Under section 360k, no preemption occurs unless a state requirement is "different from, or in addition to" a federal requirement. Therefore, to the extent that the plaintiffs' manufacturing and labeling claims were based on allegations that the pacemaker lead did not comply with FDA requirements, they were not preempted. *Id.* at 2254-55. According to the Court, this conclusion was consistent with the FDA's own interpretation of the preemption provision in its administrative rules, to which the Court accorded significant deference. *Id.* at 2255-56.

The Court then undertook "a careful comparison between the allegedly pre-empting federal requirement and the allegedly pre-empted state requirement to determine whether they fall within the intended pre-emptive scope of the statute and regulations."[2] *Id.* at 2257-58. Under the first

---

[2] 21 CFR section 808.1 provides, in part:

"(d) State or local requirements are preempted only when the Food and Drug Administration has established specific counterpart regulations or there are other specific requirements applicable to a particular device under the act, thereby making any existing divergent State or local requirements applicable to the device different from, or in addition to, the specific Food and Drug Administration requirements. There are other State or local requirements that affect devices that are not preempted by section 521(a) of the act * * *. The following are examples of State or local requirements that are not regarded as preempted by section 521 of the act:

"(1) Section 521(a) does not preempt State or local requirements of general applicability where the purpose of the requirement relates either to other

prong of its analysis, the Court concluded that the federal requirements pertinent to Class III devices that had been marketed pursuant to the "substantially equivalent" provisions of section 510(k) reflect "entirely generic concerns about device regulation generally" and "not the sort of concerns regarding a specific device or field of device regulation which the statute or regulations were designed to protect from potentially contradictory state requirements." *Id.* at 2258. Under the second prong of its analysis, the Court concluded:

> "Similarly, *the general state common-law requirements in this case were not specifically developed 'with respect to' medical devices. Accordingly, they are not the kinds of requirements that Congress and the FDA feared would impede the ability of federal regulators to implement and enforce specific federal requirements.* The legal duty that is the predicate for the Lohrs' negligent manufacturing claim is the general duty of every manufacturer to use due care to avoid foreseeable dangers in its products. Similarly, the predicate for the failure to warn claim is the general duty to inform users and purchasers of potentially dangerous items of the risks involved in their use. These general obligations are no more a threat to federal requirements that would be a state-law duty to comply with local fire prevention regulations and zoning codes, or to use due care in the training and supervision of a workforce. These state requirements therefore escape pre-emption, not because the source of the duty is a judge-made common-law rule, but rather because their generality leaves them outside the category of requirements that § 360k envisioned to be 'with respect to' specific devices such as pacemakers."

*Id.* (emphasis supplied). In sum, the Court concluded that none of the state tort claims was preempted.

In this case, plaintiff argues that application of the *Medtronic* analysis leads to the conclusion that her claims are not preempted by section 360k. Defendants Collagen and Marshall respond that *Medtronic* is factually distinguishable

products in addition to devices (e.g., requirements such as general electrical codes, and the Uniform Commercial Code (warranty of fitness)), or to unfair trade practices in which the requirements are not limited to devices.

"(2) Section 521(a) does not preempt State or local requirements that are equal to, or substantially identical to, requirements imposed by or under the act."

and that the *Medtronic* analysis compels conclusion that all of plaintiff's state law claims are preempted by section 360k. We must follow the method of analysis in *Medtronic* by undertaking a "careful comparison between the allegedly pre-empting federal requirement and the allegedly preempted state requirement to determine whether they fall within the intended pre-emptive scope of the statute and [FDA] regulations." *Id.* at 2257-58. We work from two presumptions: First, "because the States are independent sovereigns in our federal system, * * * Congress does not cavalierly pre-empt state-law causes of action"; second, the purpose of Congress is the "ultimate touchstone" regarding preemption. *Id.* at 2250.

In our previous opinion, we set forth the facts pertinent to the FDA's approval of Collagen's PMA application for the medical device Zyderm:

> "The FDA, upon recommendation of its Surgical and Rehabilitation Devices Panel, approved Collagen's PMA application for Zyderm by letter on July 22, 1981, and by order published on September 18, 1981. 46 Fed Reg 46,394 (1981). PMA approval was made subject to a set of conditions including an extension of the post-approval immunological study; distribution with the device of a patient information brochure; submission in final printed form of labeling and informational package inserts; prior submission of PMA supplements before making changes involving indications for use, labeling, manufacturing, packaging or ingredients; and required reports. Between initial PMA approval and the time plaintiff began treatment, Collagen had submitted 16 PMA supplements seeking approval for changes in ingredients, manufacturing processes, labeling and physician's package inserts. Changes were approved only after Collagen complied with FDA requests to submit additional data or to include specified language on labels or physician's package inserts."

*Mears,* 137 Or App at 395.

We turn to plaintiff's pleadings. In her strict liability claims, plaintiff alleges that Collagen manufactured, designed, marketed, promoted and distributed the products

Zyderm and Zyderm FL, which Marshall injected into plaintiff between April and August of 1991. She alleges that Zyderm and Zyderm FL are Class III medical devices requiring premarket approval from the FDA and that Collagen did not apply for premarket approval or submit a supplemental premarket approval application for Zyderm FL until October 1991, after the FDA had seized and destroyed Collagen's stock of Zyderm and Zyderm FL. She alleges that, in conjunction with its initial PMA application for Zyderm, Collagen knowingly submitted false, fraudulent or misleading data to the FDA concerning whether injection of bovine collagen could cause autoimmune reactions. Plaintiff alleges that Marshall provided her with no information about these medical devices, advised her that there were no risks involved with their use and stated that the devices could not harm her. Plaintiff also alleges that, given the immune damage risks involved, the devices were unreasonably defective and dangerous. Plaintiff further alleges that, given the immune damage risks involved, the devices were unreasonably dangerous and defective because inadequate warnings were given to physicians and patients concerning immune damage. Finally, plaintiff alleges that Zyderm FL was unreasonably dangerous and defective because its package label and inserts failed to warn that it had not been approved by the FDA or falsely claimed that Zyderm FL had been approved by the FDA.

In her negligence claims, plaintiff alleges that Collagen failed to exercise reasonable care in designing and testing the devices, negligently failed to warn doctors of the autoimmune risks involved, and marketed, promoted and distributed the devices despite its knowledge of those risks. She alleges that Collagen was negligent in failing to disclose fully to the FDA before PMA approval certain information concerning risks of autoimmune disease and was negligent in providing false, incomplete or erroneous material to the FDA. She further alleges that both Zyderm and Zyderm FL failed to conform to the product specifications set out in Zyderm's PMA. Concerning Marshall, plaintiff alleges that he breached his duty of care by failing to educate himself regarding the risks of the devices, by failing to warn her of the risks involved and by selling and administering the devices to her.

She further alleges that Marshall injected her with the devices without obtaining informed consent, because he failed to advise her of the risks and failed to disclose that Zyderm FL had not been approved for use in humans.

In her breach of warranty claims, plaintiff incorporates the allegations described above and alleges that defendants warranted that Zyderm and Zyderm FL were safe, effective, free from risk and could not cause autoimmune disease. Plaintiff alleges that defendants impliedly warranted that Zyderm and Zyderm FL were merchantable and fit for their intended purpose. We examine plaintiff's claims separately to determine if any are preempted. *Medtronic,* 116 S Ct at 2257-58.

### Failure to Comply with FDA Requirements

■ Plaintiff's strict liability and negligence claims against Collagen allege that Collagen failed to comply with FDA requirements in numerous respects.[3] Materials submitted on summary judgment, when viewed in the light most favorable to the nonmoving party, *Jones v. General Motors Corp.,* 325 Or 404, 408, 939 P2d 608 (1997), support plaintiff's claims in this regard.[4] As alleged by plaintiff in her pleadings, and demonstrated by materials submitted for purposes of summary judgment, the FDA seized and destroyed Collagen's entire inventory of Zyderm and Zyderm FL shortly after plaintiff's final injection in August 1991. Collagen concedes

---

[3] We understand plaintiff's allegations that Collagen knowingly submitted false and misleading data to the FDA in conjunction with its applications to be allegations that Collagen failed to comply with FDA requirements, one of which is that all known information must be provided to the FDA in the course of the PMA process. 21 USC § 360e(c).

[4] One of the issues that had divided federal courts of appeals before *Medtronic* is whether a manufacturer's failure to comply with the MDA's requirements is an exception to the preemption provision. We agreed with the First Circuit on that issue and held that the claims are preempted, *Talbott v. C.R. Bard, Inc.,* 63 F3d 25, 27 (1st Cir 1995). *Mears,* 137 Or App at 408. Plaintiff did not ask us to reconsider that holding in her petition for reconsideration. *See Mears v. Marshall,* 138 Or App 476, 909 P2d 212 (1996) (responding to plaintiff's allegations of failure to consider recent Ninth Circuit opinion and rejecting Tenth Amendment argument for first time). In *Medtronic,* however, all nine justices agreed that claims based on a manufacturer's failure to comply with the MDA are not preempted. Consequently, we have reexamined the record on summary judgment and reach a conclusion different from that in our first opinion.

that this seizure occurred because the medical devices were misbranded: The package inserts for both Zyderm and Zyderm FL did not conform to FDA labeling requirements. The consent decree concerning that seizure declared that the labeling of the devices was false or misleading and that the labeling failed to provide adequate warnings in certain respects. Thus, to the extent that plaintiff's claims are based on her allegations that the devices were improperly labeled in violation of FDA requirements, the trial court erred in granting summary judgment to defendant Collagen. *Medtronic*, 116 S Ct at 2255.

■     Plaintiff also alleges, and Collagen does not dispute, that at the time plaintiff received an injection of Zyderm FL, Collagen had not yet submitted the PMA supplement that the FDA determined was necessary in order for Zyderm FL to be marketed. Collagen's argument that Zyderm FL ultimately *was* approved by the FDA is beside the point. Plaintiff's allegation that the device had not been approved by the FDA at the time she was injected with it survives both prongs of the inquiry established in *Medtronic*: First, Zyderm FL had not been approved for marketing by the FDA at the time plaintiff was injected and, thus, no preempting federal requirement could have existed. Second, a successful claim based on that assertion would not establish a specific state requirement that was different from, or in addition to, a specific federal requirement. Because Zyderm FL had not been approved by the FDA for use in humans at the time that plaintiff was injected with it, none of plaintiff's claims concerning Zyderm FL is preempted by the MDA, and defendant Collagen therefore was not entitled to summary judgment on plaintiff's negligence and strict liability claims insofar as those claims pertained to Zyderm FL. Neither was defendant Collagen entitled to summary judgment on plaintiff's negligence and strict liability claims insofar as those claims assert that Collagen failed to comply with FDA requirements.

Finally, plaintiff alleges that Collagen withheld crucial information from the FDA during the initial PMA process for Zyderm. As noted above, *see* note 3 above, that allegation, in essence, is an allegation that Collagen failed to comply with FDA requirements. Plaintiff's claims, insofar as

they are based on this allegation, are not preempted by the MDA.

Plaintiff's claims also involve allegations that are not dependent on her allegations that Collagen failed to comply with FDA requirements. We turn to her negligence and strict liability claims to determine what, if any, portions of those claims are preempted by the MDA.

### Failure to Warn

Plaintiff's negligence and strict liability claims involve at least some allegations that defendants failed to warn her (or that defendant Collagen failed to warn defendant Marshall) of risks concerning injection of the device.[5] Defendants contend that *Medtronic* is distinguishable because Zyderm, unlike the pacemaker lead in *Medtronic*, was subject to specific federal labeling requirements. We agree that this case is factually distinguishable from *Medtronic*. Nonetheless, under the two-pronged analysis prescribed by *Medtronic*, we conclude that plaintiff's claims based on failures to warn are not preempted.

Plaintiff alleges that defendants failed to provide adequate warnings concerning the risks of autoimmune disease caused by Zyderm. In *Medtronic*, the Court based its conclusion that the plaintiffs' labeling claims were not preempted partly on the fact that the pacemaker lead at issue in that case was subject only to general federal requirements that pertained to all medical devices and that there were no specific federal requirements pertaining to the device because it had been marketed pursuant to the substantial equivalency exception of section 510(k). Defendants are correct that the Court emphasized that the section 510(k) process is considerably less rigorous than the PMA process and results in no specific requirements being imposed on "substantially equivalent" medical devices. *Medtronic*, 116 S Ct at 2247-48. Once a medical device has been approved pursuant to the PMA process, it "may not be manufactured, packaged,

---

[5] As noted above, Zyderm FL was not subject to specific federal requirements, because it had not been approved by the FDA at the time it was injected into plaintiff. Thus, the following discussion pertains only to plaintiff's allegations concerning Zyderm.

stored, labeled, distributed, or advertised in a manner that is inconsistent with any conditions to approval specified in the PMA approval order for the device." 21 CFR § 814.80. Zyderm was marketed only after completing the full PMA process. Without question, that process established requirements that governed nearly every aspect of Zyderm's commercial existence. Unlike the pacemaker lead at issue in *Medtronic*, Zyderm was subject to specific federal requirements under the MDA. *See Oja v. Howmedica*, 111 F3d 782 (10th Cir 1997) (Class III device that went through PMA process was subject to specific federal requirements); *Armstrong v. Optical Radiation Corp.*, 50 Cal App 4th 580, 57 Cal Rptr 2d 732 (1996); (same). Under *Medtronic*, however, imposition of special federal requirements is not itself dispositive of the question of preemption. We turn to the second prong of the test prescribed by *Medtronic:* whether plaintiff's claims could have the effect of creating state law requirements specifically developed "with respect to" the medical device in question. *Medtronic*, 116 S Ct at 2258.

■ In undertaking the second prong of the analysis in *Medtronic*, the Court appeared to rely heavily on relevant FDA regulations. *See* note 2, above (quoting regulation in part). Those regulations provide that a state requirement will not be preempted if it "relates to other products in addition to devices * * * or to unfair trade practices in which the requirements are not limited to devices." 21 CFR § 808.1(d)(1). One of the examples used in that regulation as a type of claim that would not be preempted is a claim of breach of warranty of fitness under the Uniform Commercial Code (UCC). *See* ORS 72.3150 (UCC implied warranty of fitness for particular purpose). In *Medtronic*, the Court concluded that "the predicate for the failure to warn claim is the *general* duty to inform users and purchasers of potentially dangerous items of the risks involved in their use." *Medtronic*, 116 S Ct at 2258 (emphasis supplied). The Court concluded that such a general duty to warn is "no more a threat to federal requirements than would be a state-law duty to comply with local fire prevention regulations and zoning codes, or to use due care in the training and supervision of a workforce." *Id*. A claim based on failure to warn under Oregon law does not, for purposes of preemption analysis, differ significantly from a

claim based on failure to warn under the Florida law that was at issue in *Medtronic*. Under *Medtronic*, the mere existence of specific federal requirements pertaining to Zyderm is not enough to trigger preemption under the MDA.[6] Preemption occurs only if both prongs of the *Medtronic* test are satisfied. Consequently, plaintiff's state law claims based on failure to warn are not preempted by the MDA, and defendant Collagen was not entitled to summary judgment on that ground.

## Manufacturing Claim

■       For the same reasons, defendant Collagen is not entitled to summary judgment on the ground of federal preemption regarding plaintiff's negligent manufacturing claim. The *Medtronic* Court rejected the virtually identical preemption argument for the same reasons that it rejected the manufacturer's argument concerning failure to warn: The state common-law duty "that is the predicate for the * * * negligent manufacturing claim is the general duty of every manufacturer to use due care to avoid foreseeable dangers in its products." *Medtronic*, 116 S Ct at 2258. Again, because the Florida tort law at issue in *Medtronic* does not differ in any way that is significant to a preemption analysis from its Oregon counterpart, we conclude that plaintiff's negligent manufacturing claims are not preempted.

---

[6] At oral argument, counsel for defendant Collagen suggested that Justice Breyer's concurrence in *Medtronic* does not demonstrate his agreement with Part V of the opinion concerning the requisite specificity of state law requirements. As noted earlier, Justice Stevens' opinion in *Medtronic* is, in part, a five-to-four majority opinion and, in part, a plurality opinion. Justice Breyer, the key fifth vote, joined in Part V, which sets forth the two-part analysis, the second prong of which entails an examination of the specificity of the state law requirements at issue. Justice Breyer's concurring opinion, however, focused narrowly on the existence (or lack) of specific federal requirements regulating the medical device in question. *Medtronic*, 116 S Ct at 2259-62 (Breyer, J., concurring in part and concurring in the judgment). We do not infer from Justice Breyer's concurring opinion, as defendant Collagen would have us do, that Justice Breyer did not intend to join the lead opinion concerning the two-part test and that we should treat Part V of the opinion as a mere plurality. A majority of the justices, including Justice Breyer, signed Part V, and we cannot disregard that vote. We do not read into Justice Breyer's discussion of specific federal requirements in his concurring opinion any indication that he disagreed with any portions of the lead opinion other than those portions of the opinion that he refrained from joining.

## Design Claim

■ Plaintiff also alleges that Zyderm was unreasonably defective and dangerous in design (strict products liability) and that defendant Collagen failed to exercise reasonable care in designing these devices. Again, under the two-prong inquiry set forth in *Medtronic*, defendant Collagen's preemption argument fails the second prong. Although the PMA process resulted in specific federal requirements that Zyderm not be marketed in an altered form without FDA approval, plaintiff's strict liability and negligence claims concerning defective design do not concern state requirements that were "specifically developed 'with respect to' medical devices." *Medtronic*, 116 S Ct at 2258, *quoting* 21 USC § 360k. Defective design claims, such as those asserted by plaintiff here, are not specific state requirements that have been developed "with respect to" medical devices. Rather, plaintiff's claims concern general duties that are equally applicable to manufacturers of virtually any type of product. *See Kernats v. Smith Industries Medical Systems, Inc.*, 283 Ill App 3d 455, 669 NE2d 1300, 1309 (1996) (following similar analysis).

## Breach of Warranty Claims

■ The *Medtronic* Court did not address whether breach of warranty claims would be preempted under the MDA. However, the majority placed particular emphasis on the FDA's regulations interpreting the preemptive scope of 21 USC, section 360. *Medtronic*, 116 S Ct at 2255 ("our interpretation of the pre-emption statute is substantially informed by those regulations"). FDA regulations declare that section 360k does not preempt "State or local requirements of general applicability where the purpose of the requirement relates * * * to other products in addition to devices[.]" 21 CFR § 808.1(d)(1). As an example of a general state requirement that is not preempted, the regulation cites the UCC's warranty of fitness. *Id*. We agree with plaintiff that her claims concerning implied warranties of merchantability and fitness relate to other products in addition to medical devices and, consequently, are not the type of specific state requirement that is preempted under the MDA. That conclusion is consistent not only with FDA regulations but also with the

two-pronged analysis dictated by the Court in *Medtronic*. *See Armstrong*, 50 Cal App 4th at 596, 57 Cal Rptr 2d at 773 (following similar analysis); *Kernats*, 283 Ill App 3d at 465, 669 NE2d at 1309-10 (same). We conclude that plaintiff's claims concerning breach of implied warranties against both defendants are not preempted by the MDA.

## Claims Against Defendant Marshall

■     In the light of the remand from the Oregon Supreme Court, defendant Marshall asks us to reconsider our conclusion that plaintiff's claims that he breached his duty of care and failed to obtain plaintiff's informed consent[7] to the medical treatments were not preempted under the MDA. *Mears*, 137 Or App at 410-12. Marshall points to nothing in *Medtronic* to support his position. In our previous opinion, we stated:

> "Nothing in the MDA establishes standards for physicians who receive [package inserts containing precautions, warnings and bibliographic materials]. Therefore, plaintiff's claim that Marshall failed to properly educate himself is not preempted by the MDA, because there is no MDA requirement that would be displaced by holding a physician to a state standard. * * *

> "Plaintiff also claims that Marshall failed to obtain her informed consent as required under ORS 677.097. The MDA and its implementing regulations do not establish requirements relating to the warnings that physicians must give to patients. * * * The MDA does not require a physician to inform a patient of all the risks and consequences associated with Zyderm use, nor does it prohibit a physician from doing so. Because there is no corresponding federal requirement to the state requirement that a physician provide a detailed explanation of the risks associated with a medical procedure when the patient requests the information, the state requirement established by ORS 677.097 is not preempted."

---

[7] In our previous decision, we concluded that plaintiff's claim of breach of express warranty was, in essence, the same as her claim concerning lack of informed consent. *Mears*, 137 Or App at 410 n 15. The parties do not take issue with that conclusion on remand, and we adhere to our previous resolution of that issue.

*Id.*, 137 Or App at 411-12. Nothing in *Medtronic* undermines those conclusions.

Having reconsidered plaintiff's claims in the light of *Medtronic*, we conclude that none of plaintiff's claims against either defendant is preempted by the MDA. Accordingly, we reverse the trial court's entry of summary judgment for defendants.

Reversed and remanded.