Opinion issued June 30, 2005



     












In The
Court of Appeals
For The
First District of Texas




NO. 01-02-00802-CV




KEITH BAKER, INDIVIDUALLY, AND IAN BAKER, INDIVIDUALLY
AND AS INDEPENDENT EXECUTOR OF THE ESTATE OF JEAN
BAKER, DECEASED, Appellants

V.

ST. JUDE MEDICAL, S.C., INC. AND ST. JUDE MEDICAL, INC.,
Appellees




On Appeal from the Probate Court Number One
Harris County, Texas
Trial Court Cause No. 312,543-402-A




O P I N I O N
          This appeal involves the issue of federal preemption of state law causes of
action arising out of the implantation of an allegedly defective heart valve in the
deceased, Jean Baker. Specifically, we must decide whether state common–law
causes of action asserted by Baker’s heirs against the valve manufacturer are
preempted by the manufacturer’s compliance with the Food and Drug
Administration’s premarket approval procedures for certain medical devices. 
Because we hold that state product-liability claims are preempted by federal law in
this case, we affirm the summary judgment granted in the manufacturer’s favor.
BACKGROUND
Legislative Background of Medical Devices Act
          In 1976, in response to mounting consumer concern over, among other things,
defective intrauterine devices, Congress passed the Medical Device Amendments
(MDA) to allow the Food and Drug Administration (FDA) to regulate medical
devices. The MDA creates three categories of medical devices. The most stringent
FDA control is over Class III devices, which are devices that either “presen[t] a
potential or unreasonable risk of illness or injury,” or which are “purported or
represented to be for a use in supporting or sustaining human life or for a use which
is of substantial importance in preventing impairment of human health.” See 21
U.S.C. § 360c(a)(1)(C)(ii)(I-II). It is undisputed that a heart valve is a Class III
medical device. 
Obtaining FDA Approval to Market Class III Devices
          1. Full PMA Approval
          Before marketing a Class III device, the manufacturer must either submit its
product to the FDA for premarket approval (PMA) or qualify for one of two
exceptions to the premarket approval process. To obtain PMA approval, the
manufacturer must provide the FDA with “reasonable assurance” that the device is
safe and effective. See 21 U.S.C. § 360e(d)(2). To do so, manufacturers submit
detailed information regarding their device, which the FDA then reviews for an
average of 1200 hours before approving or disapproving the device. Medtronic, Inc.
v. Lohr, 518 U.S. 470, 477, 116 S. Ct. 2240, 2247 (1996). 
          2. § 510(k) Exemption to PMA approval
          In addition to the “rigorous” PMA process, there are two exemptions by which
a manufacturer may gain the FDA’s permission to market a device. Id. at 477-78, 116
S. Ct. at 2247. One of these exemptions permits devices that are “substantially
equivalent” to devices existing in 1976


 to be marketed and sold without full PMA
approval. See 21 U.S.C. § 360j(g)(1). This review is known as a section 510(k)
review (after the number of the section in the original act) and is “by no means
comparable to the PMA process.” Lohr, 518 U.S. at 479, 116 S. Ct. at 2247. As
opposed to the PMA’s average review time of 1200 hours, a § 510(k) review takes
an average of only 20 hours to complete. ” Lohr, 518 U.S. at 478, 116 S. Ct. at 2247.
          3. PMA Supplementation for Modifications to PMA–Approved Devices
          If a manufacturer wants to modify a Class III device that already has PMA
approval, the manufacturer may submit a PMA supplement, rather than obtain an
entirely new PMA approval. See U.S. v. Prigmore, 243 F.3d 1, 5 (1st Cir. 2001) 
(describing PMA supplement process). The PMA supplement “must contain
scientific information that provides a basis for approval of the modified device.” Id.
(quoting 21 C.F.R. § 814.39(c)). The procedures for a PMA supplement are the same
as those for an original PMA, although the FDA requires only that the manufacturer
provide materials supporting the proposed modification. Worthy v. Collagen Corp.,
967 S.W.2d 360, 364-65 (Tex. 1998); Kemp v. Medtronic., Inc., 231 F.3d 216, 222
(6th Cir. 2000).
Factual Background
          In 1982, the FDA approved St. Jude’s initial PMA application for a mechanical
heart valve. During the following years, St. Jude made several improvements to the
valve, which were approved through a series of PMA supplements. One of these
improvements incorporated a rotating sewing cuff, which eliminated the need for
surgery to position the valve before sewing it in place.
          In an effort to combat endocarditis, a life-threatening infection of the heart
muscle,


 St. Jude notified the FDA that it planned to develop a mechanical heart valve
with an infection-resistant, sterile, silver coating on the sewing cuff. In May 1997,
after an FDA-required animal test was completed, St. Jude submitted a PMA
supplement to add the Silzone


 coating to its already approved heart valve.
          In March 1998, the FDA approved St. Jude’s PMA supplement. As part of its
approval, the FDA imposed several post-approval requirements, including how the
valve could be marketed. Specifically, the FDA prohibited St. Jude from making any
claims about the efficacy of the Silzone coating in preventing endocarditis. St. Jude
began marketing the Silzone valve accordingly.
          St. Jude, however, continued to participate in studies to determine the efficacy
of the Silzone coating in preventing endocarditis. One of these studies was the
Artificial Valve Endocarditis Reduction Trial (AVERT). On January 21, 2000,
approximately one month before Baker’s death, an independent board reviewing the
AVERT data concluded that patients with the Silzone valve were more likely to
experience a post-operative complication known as a paravalvular leak. 
Approximately 2% of the patients with the Silzone valve experienced such leaks, as
opposed to .25% of patients with conventional valves.
          The same day that it became aware of the conclusions of the AVERT
monitoring board, St. Jude began a voluntary recall of all non-implanted Silzone
valves, and so informed the FDA. In response, the FDA, in a letter from Edwin Dee
to St. Jude, stated, “We agree with your firm’s decision to recall [the Silzone valve]
. . . We have reviewed your action and conclude that it meets the formal definition of
a ‘Recall.’” This is significant, as your action is an alternative to a Food and Drug
Administration legal action to remove the defective products from the market.”


 It
is undisputed, however, that the FDA never formally withdrew its PMA approval of
the valve, and that the valve had FDA approval on the date it was implanted in Baker.
          The decedent in this case, Jean Baker, a 66-year-old woman, had undergone
open heart valve–replacement surgery in November 1999. A Silzone–coated heart
valve, manufactured by St. Jude, was implanted in Baker to replace her own
deteriorating mitral heart valve. In February 2000, approximately one month after St.
Jude issued its voluntary recall of the valves, Baker died.
          Baker’s two sons, Ian Baker and Keith Baker, filed this wrongful death suit
against St. Jude based on theories of negligence, product liability, breach of warrant
under the Deceptive Trade Practices Act, malice, and fraud. St. Jude filed a motion
for summary judgment, contending that the appellee’s state court claims were
preempted by the FDA’s federal regulation over the valves at issue. The trial court
agreed, and granted St. Jude’s motion for summary judgment.
ANALYSIS
Standard of Review for Summary Judgments
          We will uphold a summary judgment only if the record establishes that there
is no genuine issue of material fact, and that the movant is entitled to judgment as a
matter of law on a ground set forth in the motion. See Tex. R. Civ. P. 166a(c); Cathey
v. Booth, 900 S.W.2d 339, 341 (Tex.1995). In reviewing the summary judgment, we
indulge every reasonable inference in favor of the non-movant, resolve any doubts
in its favor, and take as true all evidence favorable to it. Pace v. Jordan, 999 S.W.2d
615, 619 (Tex. App.—Houston [1st Dist.] 1999, pet. denied).
Preemptive Effect of PMA Approval
          1. Can a State-Court Action be a Prohibited State “Requirement”?
          State laws that conflict with federal laws are preempted under the Supremacy
Clause of the Constitution. U.S. Const. Art. VI, cl. 2. Congressional intent to
preempt state law can either be expressly stated in statutory language or implied in
the structure and purpose of federal law. Cipollone v. Liggett Group, Inc., 505 U.S.
504, 516, 112 S. Ct. 2608, 2617 (1992). The MDA contains an express preemption
provision, which provides as follows:
[N]o State or political subdivision of a State may establish or continue
in effect with respect to a device intended for human use any
requirement–
(1) which is different from, or in addition to, any
requirements applicable under this [Act] to the device,
and 
(2) which relates to the safety or effectiveness of the device
or to any other matter included in a requirement applicable
to the device under this [Act].

21 U.S.C. § 360k (emphasis added). The initial issue, thus, is whether a state tort
lawsuit can ever be a state “requirement,” prohibited by § 360k.
          The Supreme Court considered this issue in Medtronic, Inc. v. Lohr, 518 U.S.
470, 116 S. Ct. 2240 (1996). In Lohr, the Supreme Court held that state-tort claims
were not preempted if a medical device received FDA approval through the § 510(k)
notification process. The majority noted that, under § 510(k) approval process, the
FDA makes no endorsement as to a product’s safety, but concludes only that it is
“substantially equivalent” to a device already on the market. The Court concluded
that because a § 510(k) approval by the FDA did not impose any federal
requirements, any requirement imposed by the states was not prohibited. 518 U.S.
at 493-94, 116 S. Ct. at 2254-55.
          The Lohr court, however, could not agree on whether a state-court action could
ever be considered a state “requirement.” Four justices of the majority (Stevens,
Kennedy, Souter, and Ginsburg) could not accept “Medtronic’s argument that by
using the term ‘requirement,’ Congress clearly signaled its intent to deprive States of
any role in protecting consumers from the dangers inherent in many medical devices.” 
518 U.S. at 489, 116 S. Ct. at 2252.
          This portion of the Lohr opinion, however, was not supported by a majority of
the members of the Court. The dissenting justices (O’Connor, Rehnquist, Scalia, and
Thomas) concluded that “a fair reading of § 360k indicates that state common-law
claims are preempted, as the statute itself states, to the extent that their recognition
would impose ‘any requirement’ different from, or in addition to, FDCA requirements
applicable to the device.” 518 U.S. at 512, 116 S. Ct. at 2263 (O’Connor, J.,
dissenting).
          Justice Breyer also refused to join the portion of the opinion holding that §
360k did not prohibit state-court actions because he was “not convinced that future
incidents of MDA preemption of common law claims will be ‘few’ or ‘rare’.” 518
U.S. at 508, 116 S. Ct. at 2261-62 (Breyer, J., concurring). Justice Breyer concluded
that, “insofar as the MDA pre-empts a state requirement embodied in a state statute,
rule, regulation, or other administrative action, it would also pre-empt a similar
requirement that takes the form of a standard of care or behavior imposed by a state-law tort action.” 518 U.S. at 504-05, 116 S. Ct. at 2260.
          As we read Lohr, a majority of the justices of the Supreme Court would hold
that a state-court tort claim can be expressly preempted by § 360k of the MDA. Since
Lohr, a majority of the federal courts considering the issue have agreed. See Horn v.
Thoratec Corp., 376 F.3d 163, 176 (3rd Cir. 2004) (holding that state common law
claims and duties were preempted because they were “in severe tension with”
requirements established by FDA in approving device); Martin v. Medtronic, Inc.,
254 F.3d 573, 585 (5th Cir. 2001) (holding that “a medical device manufacturer’s
compliance with the FDA’s PMA process will preempt state tort law claims with
respect to that approved device and relating to safety, effectiveness or other MDA
requirements when the substantive requirements imposed by those claims potentially
conflict with PMA approval.”); Kemp v. Medtronic, Inc., 231 F.3d 216, 230 (6th Cir.
2000); Mitchell v. Collagen Corp., 126 F.3d 902, 913-14 (7th Cir.1997); Brooks v.
Howmedica, Inc., 273 F.3d 785, 796 (8th Cir. 2001); Papike v. Tambrands, Inc., 107
F.3d 737, 742 (9th Cir.1997); but see Oja v. Howmedica, Inc., 111 F.3d 782, 789
(10th Cir. 1997) (common-law failure to warn claim is not subject to preemption
under the MDA); Goodlin v. Medtronic, Inc., 167 F.3d 1367 (11th Cir. 1999)
(holding that simple approval of a PMA application imposes no federal
“requirements”); In re St. Jude Medical, Inc., 2004 WL 45503, *10 (D. Minn. Jan. 5,
2004) (same).
          Importantly, the Texas Supreme Court has held that “a federal requirement
concerning a device can preempt a suit in which the claim is that the device should
have been made or marketed differently provided . . . the federal requirement is
sufficiently specific.” Worthy v. Collagen Corp., 967 S.W.2d 360, 371 (Tex. 1998)
(emphasis added).
          The Supreme Court has recently reaffirmed that a “requirement” can reach
beyond positive enactments, such as statutes and regulations, to embrace common-law duties. Bates v. Dow Agrosciences, L.L.C., 125 S. Ct. 1788, 1798 (2005). “A
requirement is a rule of law that must be obeyed; an event, such as a jury verdict, that
merely motivates an optional decision is not a requirement.” Id. at 1799. Like the
preemption clause in Bates, § 360k prohibits requirements that are different from, or
in addition to those provided in the federal act. A state-law requirement is not
preempted if it is equivalent to, and fully consistent with, the federal act. See id. at
1800.
          Based on the authorities cited above, we conclude that state-tort claims can
impose prohibited state “requirements” under § 360k of the MDA if a jury award on
the cause of action would conflict with or add to a specific requirement set by the
FDA for the device at issue. That is, if a jury award on the asserted cause of action
could potentially set a standard of care different from that specifically set by the FDA,
the state law cause of action would constitute a prohibited state-law “requirement.” 
Accordingly, we disagree with appellants’ assertion that their lawsuit merely seeks
“remedies,” but does not impose any additional state “requirements.”



          2. Does the PMA/PMA Supplement Process Impose Federal Requirements?
          The issue of whether a state law cause of action imposes a state requirement
is irrelevant if there is no federal requirement to preempt the state requirement. In
Lohr, the Supreme Court held that, under the less rigorous § 510(k) approval process
there was no federal requirement imposed because the FDA makes no endorsement
as to a product’s safety, but concludes only that it is “substantially equivalent” to a
device already on the market. Thus, the Court concluded that a § 510(k) approval by
the FDA did not impose any federal requirements. 518 U.S. at 493-94, 116 S. Ct. at
2254-55. There being no federal requirement, no issue of preemption was raised.
          Appellants argue that, like the 510(k) process evaluated in Lohr, the PMA
supplement process is too “abbreviated” to have imposed any “federal requirements.” 
In support, appellants argue that the PMA Supplement took only 10 months to obtain
and the entire file for the supplement is only 2 inches thick.
          We disagree with appellants’ characterization of the PMA supplement process
as “abbreviated.” In Kemp v. Medtronic, the Sixth Circuit considered an argument
that the PMA supplement process was less rigorous than the initial PMA approval
process. 231 F.3d at 227. The court noted that
[t]his distinction [between the rigors of an initial PMA and a PMA
Supplement] is readily understandable because a PMA requires review
of a previously unapproved device that does not qualify for exemption
either as substantially equivalent to devices extant in 1976 or as in IDE. 
By contrast, a PMA Supplement proposes changes to a device that has
already received rigorous review and approval during the original PMA
process. Hence, because the FDA has already made a determination as
to the safety and effectiveness of the underlying device in the original
PMA, it can evaluate only the proposed modifications presented in the
PMA Supplement while relying on its earlier approval of the original
device.

Id. Similarly, a federal district court in Texas has adopted the reasoning of Kemp and
held that “for purposes of a preemption analysis . . . there is no difference between the
PMA process and the PMA Supplement process.” In re Medtronic Polyurethane
Insulated Pacing Lead Prod. Liability Litigation, 96 F. Supp.2d 568, 570 (E.D. Tex.
1999). In fact, the federal regulations applicable to PMA supplements provide that
“all procedures and actions that apply to an application under [an initial PMA] also
apply to PMA supplements except that the information required in a supplement is
limited to that needed to support the change.” 21 C.F.R. § 814.39(c).
          There is no categorical distinction between a device approved solely on a PMA
application and a device that has been approved through a PMA application coupled
with a subsequent PMA supplement. If we were to accept appellants’ argument that
the PMA supplement must itself be as exhaustive as the initial PMA, there would be
no need for PMA supplements. Rather, an entire new PMA application would be
required for each product innovation. Therefore, in analyzing whether the PMA
approval process is sufficient to support a finding that federal regulations were
imposed, we believe that we must look at the initial PMA and the PMA Supplement
together. Thus, the proper inquiry is to consider the initial PMA application and the
PMA supplement, as a whole, in determining whether federal requirements have been
imposed. 
          In concluding that PMA approval imposed federal requirements, the Worthy
court considered the specificity of the manufacturer’s presentation to the FDA, the
amount of time required to obtain approval, the recurrence of the investigation a
decade later, the prohibition against deviation from the conditions of approval, and
the FDA’s specific finding that the product was “safe and effective.” 967 S.W.2d at
376. 
          We find many of these same factors present in this case. St. Jude’s submissions
to the FDA in connection with the initial PMA included detailed information about
its intended use, manufacturing methods, design, testing, labeling, etc. The FDA
imposed specific conditions, including the required labeling for the valve. The FDA
imposed precise manufacturing standards. The initial PMA application took nearly
two years to complete.
          The PMA Supplement process, which addressed only the addition of the silver
coating to the sewing cuff, was equally as exacting and took an additional 10 months. 
The FDA required that St. Jude conduct certain animal tests, which St. Jude
conducted before ever submitting its PMA Supplement application. St. Jude’s PMA
supplement application included detailed information regarding how the silver
coating would be manufactured. Specifically, a coating of silver 0.4 microns thick
would be applied to the rotating cuff by using an ion beam to assist the deposition
process. The application further stated that the manufacturing process for the Master
Series mechanical heart valve with and without Silzone was identical, with the
exception of the silver coating. In four amendments to its PMA Supplement
application, St. Jude, at the request of the FDA, provided further substantiation
regarding the benefits of the silver cuff, labeling changes regarding the effectiveness
of reducing endocarditis in humans, revisions to a proposed clinical study, and
information regarding corrosion issues that had been raised by an FDA expert. St.
Jude’s final amendment to its PMA Supplement application included a detailed
explanation of the sewing cuff attachment mechanism, a discussion of the
manufacturing and assembly process, and a discussion regarding corrosion issues.
          Finally, some 10 months after St. Jude filed the PMA Supplement application
and over two years after initially proposing the silver cuff to the FDA, the FDA
approved the PMA Supplement for the Masters Series valve with the Silzone coating. 
The FDA’s approval was conditioned on certain labeling, including a requirement
that, when the term “Silzone” was used, that it be followed by an asterisk that directed
the reader to a prominently placed footnote explaining that no clinical studies were
performed to evaluate the effect of the Silzone coating in reducing the incidence of
endocarditis.
          Like the Worthy court, we conclude that the FDA’s approval of the PMA
supplement device constituted a finding that the device, as modified, was “safe and
effective,” see 21 U.S.C. at § 360e(d)(2), although the FDA did not allow St. Jude to
make any claims about its effectiveness in preventing endocarditis.


 This conclusion
is supported by the FDA’s own words in its letter approving the PMA Supplement,
wherein the FDA notes that further PMA Supplements are required whenever a
“device is to be modified and the modified device should be subjected to animal or
laboratory or clinical testing designed to determine if the modified device remains
safe and effective.” (Emphasis added).
          Accordingly, we hold that the PMA approval process that St. Jude went
through in obtaining FDA approval, including both the initial application process and
the PMA Supplement process for the Silzone-coated cuff, was sufficiently specific
to impose federal requirements on St. Jude regarding the manufacture and labeling
of the heart valve. 
          2. Are Appellants’ State-Court Causes of Action Prohibited “Requirements”?
          Having decided that state-tort claims can be prohibited state “requirements” 
under § 360k, and that the PMA and PMA Supplement process imposed federal
requirements in this case, we must now decide whether appellants’ state-law claims
impose requirements that potentially conflict with or add to the FDA’s requirements. 
To do so, we examine the allegations made under each cause of action.
                    A. Negligence/Products Liability/DTPA
          In their petition, appellants contend that St. Jude was negligent in the design,
manufacture, and marketing of the Silzone valve. Under their products-liability
claims, the appellants contend that the Silzone valve was unreasonably dangerous and
defective and was defectively manufactured. Under their DTPA claim, appellants
allege that St. Jude made promises and express warranties that the product was safe
and that there were implied warranties of merchantability and fitness in connection
with the product. In sum, the appellants’ claims all require them to prove that the
Silzone valve was not safe.
          In Worthy, the Texas Supreme Court considered whether preemption applied
to a product that had been approved by the FDA through a PMA application and
following PMA supplement. 967 S.W.2d at 364-65, 376-77. The plaintiff in that
case brought DTPA claims, asserting that the product, Zyderm, was unsafe for her
use. Such a finding, the court noted, would “contradict not only the FDA’s specific
finding to the contrary but also the manufacturing, distribution, and labeling protocols
approved by the FDA.” Id. at 376. The court also noted that there was “no difference
in substance” between the plaintiff’s claims under the DTPA or “common law claims
for negligence, breach of warranty, and products liability.” Id.
          Based on Worthy, we conclude that appellants’ claims for negligence, products
liability, and DTPA violations are preempted because they would require a finding
that the Silzone valve was unsafe, a direct contradiction to the PMA approval and
PMA supplemental approval granted by the FDA. In other words, the jury could
potentially set a standard of care for St. Jude that was over and above what the FDA
had determined was necessary to produce a safe product. The FDA had set specific
manufacturing and labeling requirements that cannot be altered by a jury’s potential
finding that another manufacturing process would have been safer or another label
clearer. Thus, we hold that appellants’ negligence, products liability, and DTPA
claims are expressly preempted under § 360k.
                    B. Fraud/Malice
          The appellants also allege that St. Jude committed fraud and acted with malice
because it did not report certain adverse events involving Silzone valves before
issuing its voluntary recall, even though the FDA had mandated that it do so.


 
Appellants argue that, because these claims rely on the enforcement of a federal
requirement, they are not “additional” state requirements.
          We agree that claims based on a manufacturer’s failure to follow the FDA’s
regulations and procedures in manufacturing and marketing a device are not
preempted. Martin, 254 F.3d at 583. “Nothing in § 360k denies [a state] the right to
provide a traditional damages remedy for violations of common-law duties when
those duties parallel federal requirements.” Lohr, 518 U.S. 470, 495, 116 S. Ct. 2255. 
Appellants contend that St. Jude knew of adverse effects at the time of Baker’s
implant, but did not report them to the FDA until the AVERT study was completed. 
Appellants argue that St. Jude’s failure to make these reports, as required by the FDA,
gave rise to a common–law cause of action for fraud and also shows malice.
          St. Jude, however, contends that this is essentially a “fraud-on-the-FDA” claim,
which the Supreme Court has held is preempted. In Buckman v. Plaintiffs’ Legal
Committee, 531 U.S. 341, 121 S. Ct. 1012, 1015 (2001), the plaintiffs contended that
the defendant made misrepresentations to the FDA to secure PMA approval for the
product at issue, and that, but for those misrepresentations, FDA would not have
approved the product and the plaintiffs would not have been injured. 531 U.S. at 343,
121 S. Ct. at 1015. The Supreme Court concluded that “policing fraud against federal
agencies is hardly ‘a field which the States have traditionally occupied,’” and held
that the plaintiffs’ claims arising out of misrepresentations made to the FDA were
“impliedly preempted.” 531 U.S. at 347, 348, 121 S. Ct. 1017. Such claims, the court
held, “inevitably conflict with the FDA’s responsibility to police fraud consistently
with the Administrations judgment and objectives.” 531 U.S. at 350, 121 S. Ct. at
1018. The Supreme Court noted that “although [Lohr] can be read to allow certain
state–law causes of action that parallel federal safety requirements, it does not and
cannot stand for the proposition that any violation of the FDCA will support a state
law claim.” 531 U.S. at 353, 121 S. Ct. at 1020.
          We also note that the FDA has the tools necessary to police and punish those
who conceal or fail to report information. As the Court detailed in Buckman,
The FDA is empowered to investigate suspected fraud, see 21 U.S.C. §
372; 21 CFR § 5.35 (2000), and citizens may report wrongdoing and
petition the agency to take action, § 10.30. In addition to the general
criminal proscription on making false statements to the Federal
Government, 18 U.S.C. § 1001 (1994 ed., Supp. V), the FDA may
respond to fraud by seeking injunctive relief, 21 U.S.C. § 332, and civil
penalties, 21 U.S.C. § 333(f)(1)(A); seizing the device, § 334(a)(2)(D);
and pursuing criminal prosecutions, § 333(a). The FDA thus has at its
disposal a variety of enforcement options that allow it to make a
measured response to suspected fraud upon the Administration.

531 U.S. at 349, 121 S. Ct. at 1017-18 (footnote omitted).

          In this case, appellants’ fraud claim is not based on a “parallel federal safety
requirement.” Rather, appellants are essentially alleging that St. Jude withheld, or
unreasonably delayed, in providing the FDA with information that it had regarding
adverse effects associated with the Silzone valve. As such, we hold that appellants’
fraud claim is really a “fraud–on–the–FDA claim,” and is, therefore, impliedly
preempted.
CONCLUSION
          Because we have held that all of appellants’ claims are preempted by federal
law, we affirm.
 
                                                             Sherry Radack
                                                             Chief Justice
 
Panel consists of Chief Justice Radack and Justices Jennings and Higley.